SETH H. ROW, OSB No. 021845
seth.row@stoel.com
CAMERON C. ZANGENEHZADEH, OSB No. 212756
cameron.zangenehzadeh@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380

*Attorneys for Plaintiff Blaze Cone Company*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| BLAZE CONE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>CHUBB INDEMNITY INSURANCE COMPANY,<br><br>    Defendant. | Case No.:  3:25-cv-01912-AN<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br>**Breach of Contract; Breach of the Duty of Good Faith and Fair Dealing; Negligence Per Se (ORS 746.230); Declaratory Judgment (ORS 28.010, *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Blaze Cone Company ("Plaintiff") alleges as follows:

## I.  PARTIES

1.      Plaintiff is an Oregon corporation with its principal place of business in Portland, Multnomah County, Oregon.  Plaintiff is a locally owned and operated small business that specializes in buying and reselling traffic safety cones and other safety products, as well as renting out work zone traffic control equipment.

Page 1 –      PLAINTIFF'S FIRST AMENDED COMPLAINT
150814117.4 0083464-00001

2.      On information and belief, Defendant Chubb Indemnity Insurance Company ("Defendant") is a New York corporation with its principal place of business in Philadelphia, Pennsylvania.  Defendant is an insurance company transacting insurance under ORS 731.146 by engaging in numerous insurance-related activities in Oregon, including, but not limited to, issuing or delivering insurance policies, collecting premiums, and investigating and adjusting claims or losses.

## II.  JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.  This Court has personal jurisdiction over Defendant because Defendant issued and delivered an insurance policy in Oregon, insured risks located in Oregon, and has purposefully availed itself of the privilege of conducting business within this State.  The claims in this action arise out of or relate to those activities.  Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of the action is situated here.

## III.  BACKGROUND FACTS

4.      Plaintiff's owner, Glen Ellis, a citizen of Multnomah County, Oregon, owns an industrial building complex located at 16825 SE 130th Avenue in Clackamas, Oregon ("Property").  Plaintiff, Glen Ellis, and a third entity, BF Properties, are alter egos of each other for purposes of the Property's ownership, insured interests, and lessor interests.

5.      The Property's main structure (approximately 32,500 square feet) was originally constructed around 1971 and expanded in several phases.

6.      At the time of loss, the west half of the Property was leased to Stages Northwest and the east half to Source Automotive.

7.      The Property was of Type V construction, with a wood-framed roof (wood purlins supporting corrugated metal panels) spanning steel trusses and was neither sprinklered nor equipped with permanent restrooms (tenants used external facilities).

8.      On October 31, 2022, a fire broke out inside the Source Automotive tenancy on the east end of the Property.

9.      The fire was severe and spread through the interior of the main structure.  The fire's intensity blew out multiple large translucent panels and exposed large portions of the Property's structural framework to extreme heat.

10.     Local fire authorities responded and extinguished the fire, but not before it caused significant structural and material damage throughout the Property.

11.     In the days following the fire, Plaintiff took steps to secure the Property and mitigate further damage.

12.     An emergency restoration contractor, Paul Davis Restoration, performed board-up services to cover openings and stabilize the structure.

13.     Debris was cleared and the site was made safe for inspectors.

14.     Plaintiff promptly notified Defendant, the insurer of the Property, of the loss and made the Property available for investigation.

15.     By mid-November 2022, Defendant's adjuster (Rowena Buist) and consultants were on site coordinating with Plaintiff's representatives and contractors.

16.     On November 18, 2022, Defendant specifically requested that the restoration contractor, BELFOR Property Restoration ("BELFOR"), work directly with Defendant's

retained building consultant, Young & Associates ("Y&A"), to develop the scope and estimate of necessary repairs, with Plaintiff's public adjuster included in communications.

17.     Defendant, at that stage, acknowledged coverage for the loss, and on January 14, 2023, issued payment of the emergency board-up invoice and an initial advance toward building repairs.

18.     Investigations revealed that the October 31, 2022, fire caused extensive structural damage to Plaintiff's Property.  The roof system and supporting steel framework were particularly hard-hit by heat and flames.  Large sections of the wooden roof purlins were severely charred or consumed by fire.

19.     Many of the exposed open-web steel roof trusses were found to be oxidized, warped, and deformed due to high temperatures.  Steel cross-bracing (angle X-braces between the steel frames) was also severely bent and distorted by the heat of the fire.

20.     Widespread heat damage was visible on the Property's metal panels and structural members—siding and roof panels were discolored and buckled, and even some heavy steel columns were darkened by heat (though the main columns did not appear to buckle).

21.     The damage to the Property was documented in photographs and reports prepared during the damage assessment.

22.     The Property housed two large overhead bridge cranes (an East crane in the Source Automotive bay and a West crane in the Stages Northwest bay) used for lifting heavy materials.

23.     Both crane systems were subjected to the fire and heat.  Post-fire inspection noted that the cranes' surfaces were darkened by soot and heat exposure.

Page 4 –     PLAINTIFF'S FIRST AMENDED COMPLAINT
150814117.4 0083464-00001

24.    The West crane, farther from the blaze, did not suffer obvious immediate failure, but did sustain damage:  a specialized inspection after the fire found components of the West crane that needed repair or replacement.

25.    In early 2023, a professional team was engaged to thoroughly assess the structural damage and plan for repairs.  This team included structural engineer Ken Oliphant, P.E., S.E. of Advanced Structural Forensics ("ASF") and architect Gary Livermore, A.I.A., P.E. of Livermore Architecture & Engineering.  Mr. Oliphant was agreed to as the engineer by BELFOR and Y&A.

26.    With Defendant's knowledge and participation, multiple site inspections and tests were conducted.  On April 6, 2023, representatives of Plaintiff, restoration contractor BELFOR, and ASF's engineer, met on site with Defendant's adjuster (Ms. Buist) and Defendant's consultant (Y&A) to discuss investigation plans.

27.    The parties agreed to undertake metallurgical testing of steel structural members and destructive examination of certain concrete footings, with Defendant funding these efforts.

28.    Under that plan, a metallurgical engineer (Mark Lisin of Lisin Metallurgical Services LLC) analyzed steel samples from the building, and BELFOR performed localized demolition of floor slab and excavation of soil to expose the Property's foundation footings for evaluation.

29.    These investigations were completed in the spring and summer of 2023 and yielded critical information about the structural integrity of the fire-damaged Property.

30.    The investigative findings not only catalogued fire damage but also uncovered underlying structural deficiencies in the Property.  Notably, the Property's lateral-load resisting system was found to be structurally deficient.  The original design included unusual "discontinuous" steel buttress frames in the west portion of the Property—essentially, steel

columns supporting the roof trusses that did not continue down to the foundation, instead attaching to side columns that supported an overhead crane beam.

31.     ASF's engineer observed that these discontinuous frames had a "grossly deficient lateral load path," meaning they were not capable of resisting code-required seismic and wind loads even.  When BELFOR opened up the floor, it was discovered that the concrete footings under these areas were undersized and inadequately reinforced as well.

32.     On August 25, 2023, ASF (Ken Oliphant) issued a comprehensive report (the "Blaze Cone Damage Assessment Report") detailing the full extent of structural damage and the recommended repair approach.  His report (23 pages plus figures) documented numerous specific findings, including:  (1) pervasive charring of wood roof members throughout the building; (2) severe heat deformation of steel roof trusses and steel bracing; and (3) the need to replace or significantly repair these elements.  The report referenced the metallurgical analysis, which confirmed that the steel trusses and steel X-braces were metallurgically compromised by the fire and required complete replacement.  It also noted that the welded connections of the crane runway beams appeared to have survived the fire.  Crucially, ASF's engineering analysis concluded that the degree of structural damage met the threshold of "Substantial Structural Damage" as defined in the building code—both for gravity load-carrying components and for vertical elements of the lateral force-resisting system.  In practical terms, this meant that simply patching the visible damage would not be code-compliant; the affected structural systems would have to be brought up to current code standards as part of the repair.

33.     According to ASF's report and preliminary design work, the necessary repair scope was expansive.  Among the major components were:  (1) full removal and replacement of the entire roof structure, including all roof trusses and purlins, because the fire had either

destroyed them or reduced their capacity such that new, code-compliant roof framing (likely a steel deck system with closer truss spacing) was required; (2) replacement of all fire-damaged steel bracing and introduction of additional structural steel to ensure the building meets modern lateral load requirements (for example, adding steel beams and gusset plates between frames to reinforce the new bracing system); (3) demolition of the deficient "discontinuous" steel frames on the west end and rebuilding them as proper continuous frames with new steel columns running to new concrete footings; the new footings and frame members would be engineered to handle current seismic forces; (4) retrofitting the remaining original frames on the east end – for instance, the heavy W12x72 steel columns on that end could stay, but their diagonal buttress members needed to be upsized (from W8 sections to W12 sections) and their base connections strengthened with added concrete and rebar in the footings; and (5) reworking the connections between the main building and the adjacent additions — the report anticipated that a seismic separation joint might be required between the rebuilt main structure and these abutting structures, which could entail demolishing an existing Concrete Masonry Unit (CMU) wall and creating a gap or other solution so that the addition structures do not impose loads on the main building's new frames. In summary, ASF's findings made clear that the Property could not simply be "repaired" back to its old state; it would effectively need partial rebuilding and structural upgrading to meet building and safety codes.

34.    Plaintiff's contractor BELFOR produced a detailed rebuild estimate after reviewing Mr. Oliphant's report of August 25, 2023, Y&A's rebuttal report of January 29, 2024, and Mr. Oliphant's rebuttal to the Y&A report, dated May 31, 2024. As of August 2024, the estimated cost to restore the Property to its pre-fire functionality (while complying with current codes) was approximately $9.6 million. This estimate explicitly followed the scope outlined in

ASF's May 31, 2024, supplemental engineering report. The high cost reflects not only the sheer extent of fire damage (replacement of the roof, cranes, and numerous structural members) but also the necessary structural upgrades and code compliance measures (such as installing larger footings, stronger frames, and a code-compliant roof diaphragm).

35. The October 31, 2022, fire catastrophe caused millions of dollars in damage to the Property and will require a major reconstruction effort to fully restore the structure.

## IV. INSURER-SPECIFIC FACTS

36. Defendant issued Insurance Policy No. D96754681 to Plaintiff, effective for the policy period of January 1, 2022, to January 1, 2023 ("Policy"), which provided commercial property insurance covering, among other premises, the Property, and included blanket building coverage with a Limit of Insurance of $6,050,000, as well as coverage for increased costs of construction required by ordinance or law.

37. Plaintiff promptly notified Defendant of the fire loss and fully cooperated with Defendant's investigation from the outset.

38. Within days of the fire, Defendant had assigned a claim number (Claim No. 092023000718) and deployed an adjuster, Ms. Buist, to investigate the loss.

39. In November 2022, Plaintiff, Ms. Buist, and Defendant's designated consulting firm Y&A began coordinating on the emergency repairs and the development of a repair scope.

40. Plaintiff granted prompt access to the Property for all inspections.

41. Defendant's involvement early on included approving and paying for initial mitigation work; for example, on January 14, 2023, Defendant paid the $22,928.24 invoice for emergency board-up and issued a $250,000 advance toward the building claim.

42. At that stage, Defendant did not dispute coverage and appeared to engage in the claim adjustment productively.

43. In the first few months post-loss, both Plaintiff and Defendant recognized that an expert structural engineering evaluation was needed due to the nature of the damage. The parties agreed to use a single engineering team (ASF and Livermore, both of whom had been retained by Plaintiff) to assess the structural damage and recommend repairs, rather than Plaintiff and Defendant having separate engineering experts, to avoid duplication or conflict.

44. Defendant's consultant Y&A expressly concurred with using Ken Oliphant of ASF as the lead engineer to evaluate the building, instead of Y&A bringing in a separate engineer at that time.

45. Throughout the spring of 2023, ASF's investigation proceeded with Defendant's knowledge. Defendant's consultant (Mike Kalbi of Y&A) participated in joint site meetings in April and May 2023 alongside Plaintiff's team, discussing testing plans and even involving a Y&A engineer (Celia Guess) in a limited peer-review capacity.

46. These early collaborations gave Plaintiff a reasonable expectation that once ASF's report was completed, Defendant would work with ASF's findings to adjust the claim.

47. After receiving ASF's damage assessment report on August 25, 2023, Defendant's position changed dramatically. The ASF report concluded that the fire had caused extensive structural damage warranting major repairs and code upgrades. Rather than accepting those conclusions or providing any substantive response, Defendant effectively put the claim on hold and sought out a more favorable opinion.

Page 9 –     PLAINTIFF'S FIRST AMENDED COMPLAINT

48. In late September 2023, Defendant informed Plaintiff that it was retaining its own engineer to "review" ASF's report, despite the prior agreement that both parties would rely on one expert for engineering:  ASF.

49. Defendant then took an inordinate amount of time to produce this new engineering evaluation.  In fact, Defendant did not deliver Y&A's engineering rebuttal report to Plaintiff until January 29, 2024—157 days (over five months) after ASF's report had been submitted.

50. During this period, Plaintiff's representatives repeatedly sought updates and urged Defendant to move the claims investigation forward, but Defendant failed to either affirm the full scope of loss or deny it; effectively, the claim was in limbo while Defendant orchestrated a second investigation.  This unjustified delay is documented—Defendant's consultant previewed as early as October 2023 that their forthcoming report would likely minimize the damage to avoid triggering code upgrades.  Defendant's experts took until the end of January 2024 to finalize that position.

51. The engineering report by Y&A (dated January 27, 2024), which Defendant then relied upon, starkly conflicted with ASF's findings.  This Y&A report significantly downplayed the extent of fire damage to the Property.  For example, it concluded that many of the steel roof trusses did *not* require full replacement and that only select portions of the structure were affected, resulting in an opinion that the repairs could be isolated and would *not* reach the threshold that triggers code-required upgrades.

52. By reducing the count and scope of "damaged" structural members, the Y&A report commissioned by Defendant, calculated the percentage of loss to be below the level that would mandate bringing the entire structure up to code.  This was a pivotal point:  if no code

Page 10 –     PLAINTIFF'S FIRST AMENDED COMPLAINT
150814117.4 0083464-00001

upgrades were required, then Defendant's liability would be much smaller than if code upgrade coverage applied.

53. Defendant's consultants appeared to be working backwards from a desired outcome—including avoiding a full code upgrade—and therefore selectively minimized the loss.

54. ASF's engineer, upon reviewing Y&A's report, identified "significant errors" in Y&A's analysis that tended to understate damage; he began preparing a rebuttal to correct those errors.

55. In a January 12, 2024, conference call, Plaintiff's representatives specifically requested a copy of Defendant's engineer's findings and supporting data so they could understand and respond.

56. As of mid-January 2024, Defendant had not furnished Plaintiff with a copy of the Y&A report or a clear statement of its coverage position.

57. Defendant acknowledged that the Y&A report was in progress and promised to deliver it by the end of January 2024. This promise was kept in terms of timing, but in the interim, Plaintiff had been left without the information needed to move forward. Defendant's delay in sharing its position breached the customary standard of prompt communication in claim handling.

58. Even when the Y&A report was finally provided, Defendant did not immediately issue a formal denial or approval of specific items—it merely forwarded the conclusions of its consultants. This forced Plaintiff to operate in a fog of uncertainty for months after ASF's report, not knowing which portions of the claim Defendant would ultimately pay or deny.

59. On April 3, 2024, nearly a year and a half after the fire, Defendant tendered a partial payment and concurrently denied other aspects of the claim. Specifically, Defendant

Page 11 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

issued an "Actual Cash Value" (ACV) payment based on Y&A's repair estimate. Defendant belatedly made other payments of undisputed loss. In total, to date Defendant has paid Plaintiff $2,478,648.42.

60.     The Y&A estimate put the required building repairs in the range of approximately $2.1 million. Defendant's ACV payment (after depreciation and deductible) was correspondingly limited—a small fraction of what Plaintiff actually needed to rebuild. At the same time, Defendant formally rejected coverage for the damage to the West crane, maintaining that the West crane had suffered no physical loss from the fire (despite the evidence of necessary repairs). Defendant refused to reimburse the approximately $1,934 cost of the post-fire crane inspection for the West crane. The basis given for these denials was the Y&A engineering report, including the opinion that the West crane and certain structural elements were not significantly damaged meant those items were not covered. Defendant did not at that time address the Ordinance or Law coverage in any detail, other than implicitly by taking the position that code upgrades were not required since, according to Y&A, the damage was below the threshold.

61.     Plaintiff, disagreeing strongly with Defendant's coverage position, took several steps to advocate for coverage of the full loss.

62.     ASF's engineer Ken Oliphant prepared a Supplemental Report (dated May 31, 2024) responding point-by-point to the Y&A findings and reinforcing that the fire damage was extensive and *had* triggered code upgrade requirements. Plaintiff provided this information to Defendant, hoping to convince Defendant to reconsider.

63.     Plaintiff further engaged Clackamas County officials for an independent evaluation. In July 2024, the County confirmed in writing that the Property *must* be brought up

to code as part of the fire repairs (due to the "substantial structural damage" and the unpermitted constructions). This County determination directly contradicted the premise of Defendant's denial (which was that code upgrades were unnecessary). Rather than accept the County's determination, Defendant unreasonably relied on the conclusions of its own consultant.

64.    By August 2024, Plaintiff obtained the $9.6 million repair estimate from BELFOR that was aligned with ASF's scope and presented it to Defendant, illustrating the gap between Defendant's payment and the actual cost of repair, which exceeds the Policy's limit. Despite all this, Defendant refused and has continued to refuse to agree to cover the difference between what it has paid and the Policy limit.

65.    In the spring of 2025 Defendant changed adjusters assigned to the claim. In May 2025, Defendant indicated that it was still investigating Plaintiff's claim. On July 3, 2025, Defendant issued a new "reservation of rights" letter indicating that it was still purportedly investigating Plaintiff's claim and requesting either information that it already had, had already asked for and to which the insured had responded, or information (including an examination under oath) that it could have and in the exercise of due diligence and proper claims handling should have asked for previously.

66.    On September 4, 2025, Defendant conducted an Examination Under Oath ("EUO") of Plaintiff's owner and representative, Glen Ellis, pursuant to the "Insured's Duties In The Event Of Loss Or Damage" condition of the Policy.

67.    During his EUO, Mr. Ellis testified that, before purchasing the Property, he personally visited Clackamas County to confirm the buildings' legal status. County officials informed him that the structures were constructed before building permits were required and were therefore grandfathered. The County advised that no drawings or records existed because

the buildings predated the existence of building permits, but that if he wished to make future renovations, he would need to obtain a permit at that time.  Mr. Ellis testified that he relied on this representation when purchasing the Property, believing the buildings were lawfully constructed.

68.     From the time he acquired the Property in 2000 through the date of loss in 2022, Mr. Ellis never obtained nor was he required to obtain a building permit for any aspect of the Property.

69.     Mr. Ellis further testified that it was not until after the fire, during communications between Plaintiff's engineer Mr. Oliphant and Clackamas County officials, that a previously unknown 1981 permit record was located in the county offices.  According to Mr. Ellis, this was the first time Clackamas County suggested that any of the structures—referred to as Buildings A, B, and C—might have been built after permits were required.

70.     Mr. Ellis testified that, if Clackamas County now asserts that Buildings A, B, and C were not compliant when constructed, he cannot independently verify that claim, explaining: "When I talked to them before, they said everything was fine.  So I don't know what to believe anymore."  This testimony shows that any alleged code noncompliance was neither known to nor reasonably discoverable by Plaintiff before the loss.  Plaintiff acted in good faith and reliance on Clackamas County representations when he purchased the Property.

71.     On October 14, 2025, Defendant issued a Coverage Position Letter to Plaintiff. The letter stated that Defendant had "completed its investigation" of the November 1, 2022, fire loss under Policy No. D96754681 and explained the basis of Defendant's coverage determination.

72.     In that letter, Defendant stated that the sole basis for denial of any additional

Page 14 –     PLAINTIFF'S FIRST AMENDED COMPLAINT
150814117.4 0083464-00001

coverage or payment is the Policy provision excluding costs "attributable to any ordinance or law that you were required to, but failed to, comply with before the loss." Defendant concluded the letter by reserving "all rights and defenses" under the Policy and at law but made no additional payment or commitment to cover Plaintiff's claim. The letter therefore constituted a partial denial of coverage for costs associated with compliance with ordinances or laws affecting the repair or replacement of the lost or damaged covered property under the Policy's "Ordinance Or Law Or Green Standards" ("Ordinance or Law") provision.

73. The Policy provides: "Throughout this Coverage Form, the words 'you' and 'your' refer to the Named Insured shown in the Declarations. The words 'we,' 'us,' and 'our' refer to the company providing this insurance. Other words and phrases that appear in 'quotations' have special meanings and are defined in the Property/Business Income Conditions And Definitions form included in this policy."

74. The Declarations identify Blaze Cone, i.e., Plaintiff, as the Named Insured.

75. The term "you" or "your," as used in the Policy, refers solely to Plaintiff—not to any prior owner, developer, contractor, tenant, lessor, predecessor entity, affiliate, or other third party.

76. Plaintiff did not construct the Property, including Buildings A, B, and C, and was never subject to any pre-loss enforcement action, requirement, or directive "attributable to any ordinance or law" by Clackamas County or any other governmental entity.

77. Neither Clackamas County nor any other governmental entity ever required Plaintiff to comply with any ordinance or law before the loss.

78. By denying coverage based on an alleged failure to comply with pre-loss ordinances or laws that Clackamas County or any other governmental authority never "required"

150814117.4 0083464-00001

Plaintiff to comply with, Defendant misinterpreted and misapplied the Policy and thereby breached its duty to adjust the claim fairly and in good faith.

79.    Defendant's denial was contrary to the Policy's plain language, Clackamas County's representations, and Oregon law governing unfair claim settlement practices.

80.    The facts outlined above demonstrate that Defendant has wrongfully denied Plaintiff's claim for full coverage of Plaintiff's loss.

81.    Defendant has not paid what it owes under Plaintiff's insurance policy.  The Policy provides coverage on a replacement cost basis with a $6,050,000 blanket limit for the building and included Ordinance or Law coverage with no dollar sublimit (meaning code compliance costs are covered in addition to direct damage).

82.    Among other provisions, the Policy's Ordinance or Law coverage applies in the context at issue here when:  (1) there is an ordinance or law in effect at the time of loss or damage that mandates "green standards" or otherwise regulates zoning, land use, or construction of covered property; and (2) that ordinance or law affects the repair or replacement of the lost or damaged covered property; and (3) the insured repairs or replaces the covered property as soon as reasonably possible.  In that event, the valuation will include:  (a) the replacement cost of the damaged and undamaged portions of the covered property, including necessary and incurred "green expenses"; or (b) the actual cash value of the damaged and undamaged portions of the covered property, if the applicable Loss Payment Basis shown in the Declarations is Actual Cash Value; (c) the costs to demolish and clear the site of the undamaged portion of the covered property; and (d) the increased cost to repair or replace the building to the same general size at the same site, or other covered property for the same general use, to the minimum standards of such ordinance or law or green standards, subject to certain specified exclusions not applicable

here.  If the insured does not repair or replace the covered property, the Policy provides that the valuation will include:  (a) the actual cash value of the damaged and undamaged portions of the covered property; and (b) the cost to demolish and clear the site of the undamaged portion of the covered property.

83.     Plaintiff's loss falls squarely within the Policy's Ordinance or Law coverage because there are ordinances or laws in effect at the time of loss or damage that mandate "green standards" or otherwise regulate zoning, land use, or construction of the Property.  And those ordinances or laws have affected the repair or replacement of the lost or damaged Property.

84.     Among other things, expert engineers determined that substantial structural upgrades, including reinforcement of lateral-force resisting systems and footings, are required to comply with current code in order to obtain the required repair permit.

85.     Defendant has failed to acknowledge or accept coverage for these code-required upgrades, despite clear policy language obligating payment where such upgrades are necessary to restore the Property in accordance with governing ordinances and law.

86.     Defendant's failure to accept coverage under the Ordinance or Law provision has deprived Plaintiff of the ability to secure financing for repairs, resulting in significant and ongoing losses that would have been avoided had Defendant honored its obligations under the Policy.

87.     Defendant's failure to accept coverage under the Ordinance or Law provision has therefore hindered Plaintiff's ability to proceed with necessary repairs or replacements of the covered Property as soon as reasonably possible.  The resulting delay has increased the cost of repairs as the costs for materials has increased during the excessive period of time that it has taken Defendant to adjust the claim.

150814117.4 0083464-00001

88.     Under the Policy Defendant agreed to pay for the "replacement cost of the damaged and undamaged portions" of the property, as well as the "increased cost to repair or replace the building to the minimum standards" of any ordinance or law that affects repair of the damaged property.  These provisions squarely apply here:  the fire triggered code upgrade requirements that affect both damaged and undamaged parts of the building (for example, undamaged structures must be brought to code as a direct consequence of the fire damage).

89.     Defendant's refusal to agree to fund the full scope of repairs up to the Policy's limits constitutes a material breach of the Policy's insuring agreements and coverage grants.

90.     Defendant's delays, denial of obvious damage, and abrupt reversal of its position on using a joint engineer all amount to a breach of the duty of good faith and fair dealing that is implied in every insurance contract.

91.     Rather than treat Plaintiff's interests equal to its own, Defendant looked for ways to minimize its payout.

92.     Defendant abandoned its duties to Plaintiff when the outcome became financially unfavorable.  It withheld material information for months and used its superior resources to burden Plaintiff with unjustified delays.  Defendant further misrepresented facts and policy provisions in connection with the adjustment and settlement of the claim.

93.     Defendant's actions contravened industry standards for fair practice and diligence that Plaintiff was entitled to expect from its insurer.

94.     Defendant's conduct in handling Plaintiff's claim violated multiple provisions of Oregon's Unfair Claims Settlement Practices Act (ORS 746.230).

95.     Defendant committed multiple unfair claim settlement practices in violation of ORS 746.230(1)(a)–(g).  These included misrepresenting facts related to the settlement of

Plaintiff's claim; failing to acknowledge and respond promptly to communications concerning the claim; failing to adopt and implement reasonable standards for the prompt investigation of claims; refusing to pay Plaintiff's claim without conducting a reasonable investigation based on all available information; failing to affirm or deny coverage within a reasonable time after receiving completed proof of loss statements; failing to make a good faith attempt to promptly and equitably settle Plaintiff's claim after liability had become reasonably clear; and compelling Plaintiff to initiate litigation to recover amounts due by offering substantially less than the amount ultimately owed.

96.     Plaintiff cannot obtain a permit to repair the Property without also performing substantial code-required structural upgrades, the cost of which exceeds the Policy's limit of liability.

97.     Plaintiff cannot fund the required code upgrades absent a binding commitment from Defendant to cover the costs up to Policy's limits of liability.

98.     Defendant's refusal to acknowledge its obligations to pay for the required code upgrades has prevented Plaintiff from obtaining financing or commencing permitted repairs and replacements.

99.     As a result, repairs and replacements have not been completed, and Plaintiff has been unable to re-rent the Property at the level that would have been possible if repairs had been completed.

100.     Had Defendant timely accepted its coverage obligations and agreed to pay for the necessary repairs and code upgrades, Plaintiff would have been able to initiate reconstruction and likely retain the prior tenants and rental income.  Instead, Plaintiff has lost rental income, which is not covered under the Policy.

101.    Defendant's unfair conduct included initially agreeing to rely on a structural expert Mr. Oliphant, then disregarding that expert's findings once they confirmed the extent of fire-related damage and the necessity of code-compliant reconstruction.  Defendant compounded the resulting harm by repeatedly delaying its investigation, coverage determination, and claim resolution.

102.    As a result of Defendant's violations of ORS 746.230(1)(a)–(g), Plaintiff has suffered damages beyond the applicable policy limits or coverages.  These damages include, but are not limited to, lost rental income from tenant spaces rendered uninhabitable by the fire, and significant increases in the cost of reconstruction caused by Defendant's delay in investigating the claim and disputing coverage.  Defendant's prolonged refusal to accept the repair scope proposed by Plaintiff's experts, and its failure to affirm or deny coverage within a reasonable time, substantially delayed Plaintiff's ability to obtain permits and commence reconstruction of the Property.  During the period of delay, construction costs have materially escalated, particularly due to inflation and current tariffs on building materials.  Plaintiff is in the process of obtaining updated cost estimates from its contractor but, based on contractor input and industry data, anticipates an increase of at least 20% over the original repair estimate.  The increased cost of reconstruction was proximately caused by Defendant's unreasonable delay.

## V.  FIRST CLAIM FOR RELIEF

### Breach of Contract

103.    Plaintiff realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

104.    Plaintiff, the named insured on the Policy, entered into a valid and enforceable insurance contract with Defendant under which Defendant agreed to insure the Property against

150814117.4 0083464-00001

risks including fire.  Plaintiff paid valuable premiums in consideration for the Policy and the coverage it provided.

105.     The Policy expressly covered direct physical loss or damage caused by fire and obligated Defendant to promptly investigate any such loss and pay all amounts necessary to repair or replace damaged property, subject to the Policy's terms, conditions, and limits.

106.     Plaintiff fully complied with all conditions precedent under the Policy, including timely notification of the loss, submission of proof of loss documentation, cooperation with Defendant's investigation, and payment of all required premiums.  Alternatively, any conditions precedent were waived, excused, or rendered futile by Defendant's conduct.

107.     Defendant breached the Policy by failing to pay the full amount of covered losses Plaintiff sustained as a result of the October 31, 2022, fire.  Defendant further breached the Policy by unreasonably delaying its investigation, disregarding the scope of repair supported by Plaintiff's structural engineer and architect, and refusing to pay for structural and code-required upgrades necessary to restore the Property.  Defendant failed to issue a timely or reasonable coverage determination and withheld payments necessary for Plaintiff to begin permitted reconstruction of the Property.  Finally, Defendant wrongfully denied coverage under the Ordinance or Law provision of the Policy.

108.     As a direct and proximate result of Defendant's breaches of contract, Defendant has caused and continues to cause Plaintiff damages in an amount to be proven at trial but not less than $3,571,351.58.

109.     Plaintiff is entitled to recover all such damages arising out of Defendant's breach of contract plus prejudgment interest at the Oregon statutory rate of 9 percent per annum under ORS 82.010.

110.    Plaintiff is entitled to recover its reasonable attorney fees and costs herein under ORS 742.061.

## VI.  SECOND CLAIM FOR RELIEF

### Breach of the Duty of Good Faith and Fair Dealing

111.    Defendant owed Plaintiff a duty of good faith and fair dealing in connection with the insurance contract issued to Plaintiff.  That duty is implied in every contract under Oregon law and exists to ensure that the benefits of the contract are delivered in a manner consistent with the objectively reasonable expectations of the parties.

112.    Plaintiff reasonably expected that Defendant would promptly and fairly investigate the fire loss, evaluate the scope of covered damage in good faith, and make timely payments to facilitate repair and reconstruction of the damaged Property.

113.    Plaintiff also reasonably expected that Defendant would give meaningful consideration to expert opinions offered by retained professionals that Defendant had agreed to, especially where those opinions were developed in coordination with Defendant's own consultants.

114.    Defendant's actions were inconsistent with those expectations.

115.    Defendant failed to conduct a reasonable and timely investigation.

116.    Defendant refused to accept the repair scope developed by the agreed-upon structural engineer and architect—despite having initially agreed to rely on them—and instead relied on a less comprehensive and inaccurate scope prepared by its own consultant.

117.    Defendant unreasonably delayed adjusting the claim, issuing payments, and responding to submitted estimates and engineering documentation.

150814117.4 0083464-00001

118.    Defendant's conduct effectively prevented Plaintiff from accessing financing and beginning repairs, even though the Policy expressly covered direct physical loss to the Property and did not exclude coverage for code upgrades.

119.    Defendant's actions had the effect of undermining Plaintiff's right to receive the benefit of the contract—namely, the prompt payment of covered losses necessary to restore the Property to code-complaint condition in accordance with applicable law.

120.    Defendant's conduct was inconsistent with the reasonable expectations of the parties and constitutes a breach of the implied duty of good faith and fair dealing.

121.    As a direct and proximate result of Defendant's breach of the implied duty of good faith and fair dealing, Defendant has caused and continues to cause Plaintiff damages in an amount to be proven at trial but not less than $3,571,351.58.

122.    Plaintiff is entitled to recover all such damages arising out of Defendant's breach of the implied duty of good faith and fair dealing plus prejudgment interest at the Oregon statutory rate of 9 percent per annum under ORS 82.010.

123.    Plaintiff is entitled to recover its reasonable attorney fees and costs herein under ORS 742.061.

## VII.  THIRD CLAIM FOR RELIEF

### Negligence Per Se (ORS 746.230)

124.    Plaintiff realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

125.    Under Oregon law, an "insurer" includes any person engaged in the business of entering into insurance policies.  ORS 731.106.  "Insurance" is defined as a contract to indemnify or pay a specified benefit upon a determinable risk.  ORS 731.102(1).  Importantly,

"[t]ransact[ing] insurance" includes not only issuing policies, but also "the investigation or adjustment of claims or losses." ORS 731.146(1)(e). No person may transact insurance in Oregon without complying with the Insurance Code. ORS 731.022. The Insurance Code includes the Unfair Claims Settlement Practices Act (ORS 746.230) among its enforceable provisions. *See* ORS 731.004. Defendant is an insurer within the meaning of ORS 731.106. It issued the Policy to Plaintiff and undertook multiple regulated insurance activities in Oregon—including the investigation and adjustment of Plaintiff's claim. In doing so, Defendant transacted insurance involving a domestic risk and was required to comply with all applicable provisions of the Insurance Code, including ORS 746.230.

126.    Insurance adjusters—like those acting on behalf of Defendant—are licensed professionals under Oregon law. ORS 744.505 prohibits individuals from acting as insurance adjusters in Oregon unless they are licensed by the Department of Consumer and Business Services. To obtain a license, resident adjusters must satisfy detailed statutory requirements, including passing an examination approved by the Director to test their "qualifications, competence and knowledge" of the Insurance Code. *See* ORS 744.525(1)(b); *see also* ORS 744.528 (nonresident adjuster qualifications). Oregon law further mandates continuing education and imposes professional standards of conduct, including prohibitions on material misrepresentation and unethical or incompetent practices. *See* ORS 744.584(1). A licensee engaging in business as an adjuster may not "violate or fail to comply with an applicable provision of the Insurance Code," including ORS 746.230. ORS 744.584(1)(o).

127.    Because Defendant is a corporation that sells insurance and provides insurance coverage to Oregon consumers, the Oregon Legislature through Oregon Revised Statute 746.230

Page 24 –     PLAINTIFF'S FIRST AMENDED COMPLAINT
150814117.4 0083464-00001

requires Defendant to follow a standard of care when handling claims independent of, in addition to, and outside of the terms of its insurance contract.

128.    ORS 746.230 provided explicit notice to Defendant of the unreasonable conduct that is prohibited and did so in terms that are consistent with the standard of care applicable in common law negligence cases.

129.    Defendant and its adjusters owed a duty to Plaintiff under ORS 746.230 to not commit or perform any of the certain unfair claim settlement practices.

130.    Defendant breached its duty by violating ORS 746.230.  That breach was the cause-in-fact of Plaintiff's injuries.

131.    Defendant committed multiple unfair claim settlement practices in violation of ORS 746.230(1)(a)–(g), including misrepresenting facts related to the settlement of Plaintiff's claim; failing to acknowledge and respond promptly to communications concerning the claim; failing to adopt and implement reasonable standards for the prompt investigation of claims; refusing to pay Plaintiff's claim without conducting a reasonable investigation based on all available information; failing to affirm or deny coverage within a reasonable time after receiving completed proof of loss statements; failing to make a good faith attempt to promptly and equitably settle Plaintiff's claim after liability had become reasonably clear; and compelling Plaintiff to initiate litigation to recover amounts due by offering substantially less than the amount ultimately owed.

132.    Defendant knew, or in the exercise of reasonable care as a corporation engaged in the business of marketing and selling insurance, should have known, that one or more of the foregoing acts or omissions would create a foreseeable risk of harm to Plaintiff.

133. The risk of harm to Plaintiff caused by Defendant's unreasonable conduct was to an interest of the kind that Oregon law intended to protect.

134. Plaintiff is within the class of persons recognized as protected under Oregon law.

135. A mutual expectation of service and reliance existed between Plaintiff and Defendant in connection with the adjustment of the claim. Defendant relied on Plaintiff to provide necessary documentation and cooperate with its investigation, while Plaintiff reasonably expected Defendant to conduct a fair investigation, objectively evaluate the loss, and resolve the claim in accordance with Oregon's statutory standards for good-faith claims handling.

136. Defendant's unfair claim settlement practices caused Plaintiff to suffer extra-contractual damages—economic damages beyond the applicable policy limits—including, but not limited to, lost rental income from tenant spaces rendered uninhabitable by the fire that could have been but have not been repaired in a timely manner due to Defendant's conduct, and significant increases in the cost of reconstruction that have occurred during the pendency of Defendant's improper adjustment of the claim that have increased the cost (which was already in excess of the Policy limit) that Plaintiff will have to pay to fully repair the Property.

137. As a direct and proximate result of Defendant's negligence per se, Plaintiff suffered damages including extra-contractual damages in an amount to be proven at trial, but not less than $4,000,000.

138. Defendant's conduct, as alleged above, was undertaken willfully, maliciously, or with a reckless and outrageous indifference to a highly unreasonable risk of harm, and with a conscious indifference to the rights, health, safety, and welfare of others, including Plaintiff.

139. Defendant knew or should have known that its violations of ORS 746.230, including misrepresenting policy provisions, failing to conduct a reasonable investigation,

unreasonably delaying and denying benefits, and refusing to negotiate in good faith, would cause substantial harm to Plaintiff.

140. Despite that knowledge, Defendant intentionally and repeatedly engaged in such conduct to advance its own financial interests, demonstrating malice or a conscious disregard for Plaintiff's rights or the rights of others.

141. Pursuant to ORS 31.730(1), Plaintiff seeks punitive damages to punish Defendant for its misconduct and to deter similar conduct in the future.

142. Plaintiff seeks punitive damages in an amount to be determined at trial, together with attorney fees and costs as allowed by law.

## VIII.  FOURTH CLAIM FOR RELIEF

### Declaratory Judgment (ORS 28.010, *et seq*.)

143. Plaintiff realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

144. Plaintiff brings this claim pursuant to ORS 28.010 *et seq*. for a declaratory judgment to resolve a justiciable controversy between Plaintiff and Defendant regarding the scope of insurance coverage available under the Policy.

145. Plaintiff and Defendant have adverse legal interests.  Plaintiff contends that the Policy obligates Defendant to pay for all fire-related damage to the Property, and for all increased costs of construction required by applicable ordinances or laws to bring the Property into compliance with current building codes.  Defendant has disputed and denied those obligations, asserting that code upgrades are not required and refusing to indemnify Plaintiff for the properly adjusted value of its losses.

146.    This dispute involves concrete, existing facts and is not hypothetical or based on future events.  The fire occurred on October 31, 2022.  The agreed-upon experts have completed investigations and issued detailed repair recommendations, including structural code upgrades required by ordinances and laws.  Defendant, in turn, has obtained its own consultants, issued only partial payment, and denied coverage for substantial portions of the loss.  The controversy is ongoing and materially affects the parties' rights and obligations under the Policy.

147.    Plaintiff's ability to proceed with permitted reconstruction of its Property, and to obtain necessary financing, depends on a binding judicial determination of the parties' respective rights and responsibilities under the Policy.  Without such a determination, Plaintiff remains unable to rebuild and continues to incur substantial economic losses.

148.    Accordingly, Plaintiff seeks a declaratory judgment that:  (1) Plaintiff has complied with all post-loss obligations under the Policy, including notice, cooperation, and documentation requirements, and has satisfied all conditions precedent to coverage; (2) the October 31, 2022, fire caused direct physical loss or damage to the Property, including the structural systems and both the East and West overhead bridge cranes, and such loss is covered under the Policy's "Building" coverage, subject to the blanket Limit of Insurance of $6,050,000; (3) the Policy's Ordinance or Law coverage applies to the October 31, 2022, loss and obligates Defendant to pay the increased costs that Plaintiff will incur to repair or replace the damaged and undamaged portions of the building to conform with standards of ordinances or laws in effect at the time of loss, including structural framing, foundations, lateral-load resisting systems, and related upgrades; (4) the Policy does not impose a separate dollar sublimit on the amount payable under the Ordinance or Law coverage part; (5) Defendant is obligated under the Policy to pay the full cost of repairs to the damaged and undamaged portions of the building as necessary to

Page 28 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

comply with applicable ordinances or laws, including the scope of repair developed by Plaintiff's engineers and as required by the Clackamas County building department, up to the limit of its Policy.

149.    Plaintiff seeks such declarations to resolve the ongoing dispute between the parties, remove the uncertainty surrounding Plaintiff's rights under the Policy, and provide necessary relief to enable Plaintiff to proceed with reconstruction required by local ordinance or law.

## IX.  PRAYER

WHEREFORE, Plaintiff requests the following relief:

A.    On its First Claim for Relief, for judgment in its favor and against Defendant in an amount to be proven at trial, but not less than $3,571,351.58, plus interest under ORS 82.010 and reasonable attorney fees and costs under ORS 742.061;

B.    On its Second Claim for Relief, for judgment in its favor and against Defendant in an amount to be proven at trial, but not less than $3,571,351.58, plus interest under ORS 82.010 and reasonable attorney fees and costs under ORS 742.061;

C.    On its Third Claim for Relief, for judgment in its favor and against Defendant in an amount to be proven at trial, but not less than $4,000,000 together with punitive damages in an amount to be established at trial;

D.    On its Fourth Claim for Relief, for declaratory judgment in its favor and against Defendant that (1) Plaintiff has complied with all post-loss obligations under the Policy, including notice, cooperation, and documentation requirements, and has satisfied all conditions precedent to coverage; (2) the October 31, 2022, fire caused direct physical loss or damage to Plaintiff's Property, including the structural systems and both the East and West overhead bridge

150814117.4 0083464-00001

cranes, and such loss is covered under the Policy's "Building" coverage, subject to the blanket Limit of Insurance of $6,050,000; (3) the Policy's Ordinance or Law coverage applies to the October 31, 2022, loss and obligates Defendant to pay the increased costs Plaintiff will incur to repair or replace the damaged and undamaged portions of the building to conform with standards of ordinances or laws in effect at the time of loss, including structural framing, foundations, lateral-load resisting systems, and related upgrades; (4) the Policy does not impose a separate dollar sublimit on the amount payable under the Ordinance or Law coverage part; (5) Defendant is obligated under the Policy to pay the full cost of repairs to the damaged and undamaged portions of the building as necessary to comply with applicable ordinances or laws, including the scope of repair developed by Plaintiff's engineers and as required by the Clackamas County building department, up to the limit of its Policy.

E.    For such other relief as the Court may deem just, equitable, and proper.

DATED:  November 10, 2025        STOEL RIVES LLP

*s/ Seth H. Row*
SETH H. ROW, OSB No. 021845
seth.row@stoel.com
CAMERON C. ZANGENEHZADEH, OSB No. 212756
cameron.zangenehzadeh@stoel.com
503.224.3380

*Attorneys for Plaintiff Blaze Cone Company*